COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Felton and Kelsey
Argued at Salem, Virginia


LORENZO ALPHONSO WRIGHT

                                              MEMORANDUM OPINION[*] BY
v.        Record No. 1030-03-3          JUDGE D. ARTHUR KELSEY
                                              DECEMBER 23, 2003
ROANOKE CITY DEPARTMENT OF
 SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
William D. Broadhurst, Judge

Matthew S.T. Clark (Lance M. Hale & Associates, on brief),
for appellant.

Heather P. Ferguson, Assistant City Attorney (William M. Hackworth,
City Attorney, on brief), for appellee.


Lorenzo Alphonso Wright appeals a decision terminating his residual parental rights

under Code § 16.1-283(C)(2), claiming that insufficient evidence supports the trial court's

decision.  Finding sufficient evidence to support the court's decision, we affirm.

I.

On appeal, "we view the evidence in the light most favorable to the prevailing party,

granting to the evidence all reasonable inferences fairly deducible therefrom." L.G. v. Amherst

County Dep't of Soc. Servs., 41 Va. App. 51, 53, 581 S.E.2d 886, 887 (2003) (citing Martin v.

Pittsylvania County Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)).

At "one or two o'clock in the morning" on June 2, 2001, the Roanoke City Department of

Social Services responded to a call that three small children were walking alone through a

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

neighborhood. Upon responding, the DSS workers found the children, ages 5, 6, and 8, alone at Wright's house. After police searched unsuccessfully for several hours for Wright, who had left the children with his wife while he went to work, DSS conducted an emergency removal of the children and placed them in foster care. Finding that returning the children to their parents would pose an "imminent threat to life or health," the Roanoke Juvenile and Domestic Relations District Court ordered the children to remain in DSS supervised foster care, and also ordered Wright and his wife to undergo psychological evaluations.

Wright entered an agreement with DSS on November 1, 2001 to regain custody of his children. The agreement required Wright to provide verification of employment and "safe, clean, and stable housing," to attend individualized counseling, and to "keep scheduled office visits with [his] children." Wright also agreed to control his "anger management problem," by refraining from outbursts in front of his children or DSS workers and to avoid any "illegal acts or criminal activities." Finally, Wright agreed to emotionally support his children and to cooperate with their living and schooling arrangements. In the event of any changes to his living, working, or counseling situations, Wright agreed to promptly notify DSS.

From the start, Wright failed to uphold his end of the agreement. He did not inform DSS of changes to his working situation. Though he started individualized counseling and anger management, he did not complete the program he entered, at times seeking counseling from the "Fatherhood" counseling program and a telephone hotline, two unauthorized sources.

Wright's "domestic issues and his anger" also continued to manifest. He often grew "very angry and upset" in front of his children during meetings with DSS officers. Wright acted "loud, very aggressive," wanting to "discuss issues in front of the children that were not appropriate." "Several times" he lost control of his anger at the DSS office, often in the

children's presence. Similar behavior and an uncooperative attitude led to his involuntary dismissal from the Fatherhood counseling program in the summer of 2002.

By September 2002, Wright had shown "little if any progress" in correcting his domestic situation. Adding to his "six convictions of domestic or family assault," Wright had been arrested and charged for assault and battery against his wife in July 2001. During his probationary period, the social worker assigned to his case also indicated that Wright "lost his job with Walmart, continues to be uncooperative and aggressive towards this worker, upsets the children and disrupts our entire office at every visit by his behavior, refuses to communicate with this agency, and has missed two schedule [sic] visits with his children." Given Wright's "consistent pattern of domestic violence" and "emotional outburst[s]," the social worker warned, the "children would be at high risk for abuse and neglect if they were returned home."

Exposure to these negative influences affected Wright's children. One social worker observed that "the children have a lot of aggression . . . and violence towards each other." She also testified that the children "have touched each other sexually in ways that have been inappropriate" to the point that the foster mother had to keep Wright's son separated from his two sisters. In particular, Wright's son has shown a pattern of deteriorating behavior. As early as age three, his mother testified, he "cussed like a sailor" and told her "F____ you" and "Kiss my _____," expressions he had learned from his father. At that early age, the boy told one of his teachers to "shut up, you witch" and called another a "f'ing witch."

Psychological tests revealed that Wright suffers from a "mixed personality disorder with paranoid, antisocial, and narcissistic features." The tests show a "pronounced elevation on a scale measuring hostility and persecutory thinking," indicating Wright's tendency toward feeling "suspicious and distrustful, rationalizing and blaming others for [his] problems." Persons exhibiting Wright's traits, the psychologist explained, "feel like swearing and smashing things, at

times; they may lose self-control and report having been physically abusive of people and objects." These traits made Wright likely to "appear self-centered and to be resentful of demands made by others." Wright also displayed the potential "presence of life-style characteristics associated with an addictive disorder, and he should be viewed as addiction-prone." The psychologist determined, in short, that Wright's personality disorder, when considered "in the context of continued relations with his wife," would likely fuel "his past-pattern of anger and domestic violence, to which the children in the household will no doubt be exposed."

With this evidence before it, the JDR court terminated Wright's residual parental rights on October 9, 2002. On appeal, the circuit court reached the same conclusion and issued a comprehensive letter opinion setting forth its findings:

> The evidence convinced me that the children were in a home wracked by domestic violence and substance abuse. The special emotional and medical needs of each child were not being met in any meaningful sense. . . . DSS properly took emergency custody of the children and they were subsequently placed in foster care. The children have been thriving ever since.

> \* \* \* \* \* \* \*

> Mr. Wright also demonstrated domestic violence and parenting problems. These had as their source a personality disorder, which led to repeated violent outbursts both at home and in the community. These outbursts often occurred in the presence of the children, upsetting all three and were a likely source of similar behavior mimicked by [the youngest son]. While Mr. Wright's behavior was not the immediate cause of the children being taken into custody, it clearly contributed to the undercurrent of explosive domestic discord that marked the parenthood of Mr. and Mrs. Wright. DSS was more than justified in maintaining foster care of the children until this problem was brought under control by Mr. Wright.

> In reviewing Mr. Wright's compliance with the plan, it is significant to bear in mind that this was not his first interaction with a DSS office. He had spent the better part of the 1990's involved with a dispute with the Newport News DSS over his older children, culminating in having his rights to those children terminated in January 2001. While Mr. Wright's involvement with those children is not probative of his treatment of the children before this

- 4 -

Court, it demonstrates that he was on notice of and aware of the consequences of failing to follow the DSS plan here.

Mr. Wright's compliance with the plan was hollow at best. While he met with the psychiatrist, he declined to take the medication that his condition required. While he met with Dr. Milan, he failed to follow up with any real counseling for the problem the doctor diagnosed. While he did convince DSS to let him temporarily postpone counseling due to his purported job demands, he [was] less than truthful about when his job schedule changed which would have enabled him to go to counseling. While DSS encouraged his participation in the "Fatherhood" program, there is no credible support for his claim that DSS allowed it to be a substitute counseling program. While this program certainly benefited Mr. Wright, it was not directed at Mr. Wright's condition, no matter how much Mr. Wright may have wanted DSS to accept it as a substitute. Similarly, Mr. Wright's insistence that he would accept attending counseling sessions aimed at his son's condition as compliance 'because it was helping him too' was simply another example of Mr. Wright's avoidance of addressing *his* problem. While this behavior may be symptomatic of his disorder, it is clear that Mr. Wright would go to great lengths to avoid complying with DSS's requirement of focused counseling. Likewise, Mr. Wright's assertion at trial that the "hotline" counseling offered at his present job should suffice is not persuasive.

Mr. Wright's condition was omnipresent. It manifested itself in an explosive fit of denial when he was faced with the school team's determination that Antwan was "retarded." Mr. Wright's hostile outbursts continued at varying degrees with DSS both in and out of the children's presence, in spite of his agreement to avoid this very behavior. Like behavior resulted in him being banned from the "Fatherhood" program which he had earlier proclaimed as correcting the problem. Perhaps most telling, the problem manifested itself in a domestic dispute that broke out between he and Mrs. Wright during the visit with the children that he clandestinely procured in June 2002.

Mr. Wright's trial testimony characterizing his meetings and compliance efforts and minimizing his failures was not persuasive. He was untruthful with DSS as to his employment. In spite of alleging that he feared for his safety in order to gain a protective order against his wife, Mr. Wright set up a visit with the children and his wife which he knew had been separately prohibited by DSS and the JDR judge. Further, he lied about that meeting and then tried to discredit the worker with the "Fatherhood" program worker [sic] that discovered it. While he clearly showed affection towards his children, and said he "would do anything" to get them back, his actions and his demeanor on the stand spoke louder than the words he uttered.

Considering the evidence as a whole, I am persuaded by clear and convincing evidence that Mr. Wright failed without cause to remedy the

conditions that led to the continued foster care of his children, and is
unlikely to do so.

(emphasis in original). Based upon these findings, the circuit court held that terminating

Wright's parental rights was "in the overwhelming best interest of each child." Wright now

appeals.

II.

Under Code § 16.1-283(C)(2), a trial court may terminate residual parental rights when

doing so is in the child's best interests and the parents "without good cause, have been unwilling

or unable" within a twelve month period from the date of the child's placement in foster care to

remedy substantially the conditions which led to or required continuation of the child's foster

care placement. See generally City of Newport News Dep't of Soc. Servs. v. Winslow, 40

Va. App. 556, 562, 580 S.E.2d 463, 466 (2003). Because "'the rights of parents may not be

lightly severed,'" M.G. v. Albemarle County Dep't of Soc. Servs., 41 Va. App. 170, 187, 583

S.E.2d 761, 769 (2003) (quoting Ward v. Faw, 219 Va. 1120, 1124, 253 S.E.2d 658, 661 (1979),

and Malpass v. Morgan, 213 Va. 393, 400, 192 S.E.2d 794, 799 (1972)), clear and convincing

evidence must establish the grounds for termination, Winslow, 40 Va. App. at 562, 580 S.E.2d at

466 (citing Code § 16.1-283(C)(2)).[1] On appeal, we must affirm the trial court's decision

"unless plainly wrong or without evidence to support it." M.G, 41 Va. App. at 181, 583 S.E.2d

at 766 (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)) (internal

quotation marks omitted).

_____

[1] Clear and convincing evidence, the requisite level of evidentiary proof required for
terminating parental rights, presents a "'more stringent standard' than a mere 'preponderance of
the evidence.'" Griffin v. Griffin, 41 Va. App. 77, 85, 581 S.E.2d 899, 903 (2003) (quoting
Congdon v. Congdon, 40 Va. App. 255, 263, 578 S.E.2d 833, 837 (2003)). This intermediate
standard entails "'that measure or degree of proof which will produce in the mind of the trier of
facts a firm belief or conviction as to the allegations sought to be established.'" Griffin, 41
Va. App. at 85, 581 S.E.2d at 903 (quoting Congdon, 40 Va. App. at 263, 578 S.E.2d at 837).

- 6 -

The factual record in this case supports the trial court's decision to terminate Wright's parental rights. Wright's six convictions for domestic or family assault since 1992 and "at least eight other" instances of unrelated assault demonstrate his propensity for "repeated violent outbursts both at home and in the community." As the trial court found, Wright contributed to a home environment "wracked by domestic violence" with fits of uncontrollable anger erupting "in the presence of the children, upsetting all three." "Explosive domestic discord" pervaded the household, pushing his wife, an admitted alcoholic, "to drinking more." In a meeting with his wife in July 2001 that occurred in violation of a court order, Wright was arrested and later convicted for assaulting and battering his wife. Wright's violent behavior also spilled outside the home, where his "hostile outbursts continued at varying degrees with DSS both in and out of the children's presence."

Wright refused to take his required medication, thereby exacerbating his anger management problems. He went "to great lengths to avoid complying with DSS's requirement of focused counseling." Though he sought counseling through the "Fatherhood" program and a "hotline" counseling service after postponing his required counseling program, DSS recognized neither program as a sufficient substitute for the treatment he really needed. And once his work schedule improved to allow him to resume approved counseling, Wright was "less than truthful" about this schedule change. He repeatedly "lied" and was "untruthful" in his interactions with DSS. Finally, the trial court reasonably concluded that, having had his parental rights terminated for his older children, Wright was "on notice of and aware of the consequences of failing to follow the DSS plan here."

Coupled with the additional factual findings made by the trial court, these circumstances established by clear and convincing evidence Wright's willful failure to remedy the conditions that led to and required the continued foster care placement of his children. For these reasons, we find

nothing plainly wrong or factually insupportable about the trial court's conclusion that terminating

Wright's parental rights was "in the overwhelming best interest of each child."

Affirmed.